In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3415

JACOB SAATHOFF, KATHY SAATHOFF,
and KELSEY MARKOU,

*Plaintiffs-Appellants*,

*v.*

ANDRE DAVIS,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:13-cv-02253-CSB-EIL— **Colin S. Bruce**, *Judge.*

ARGUED MAY 20, 2016 — DECIDED JUNE 20, 2016

Before FLAUM and MANION, *Circuit Judges*, and ALONSO,
*District Judge.*[*]

ALONSO, *District Judge*. After Champaign, Illinois police
officer Andre Davis shot and killed their dog, plaintiffs-

---

[*] Of the Northern District of Illinois, sitting by designation.

appellants, Jacob Saathoff, Kathy Saathoff, and Kelsey Markou, sued Davis and the City of Champaign under 42 U.S.C. § 1983 for violating their Fourth Amendment rights. The § 1983 claim against Davis was tried to a jury, which returned a verdict for Davis. The district court entered judgment on the verdict. Plaintiffs appeal from that judgment, which we affirm.

## FACTUAL BACKGROUND

Jacob and Kathy Saathoff are husband and wife. Markou is Kathy's daughter and Jacob's stepdaughter. The Saathoffs and Markou owned a chocolate-colored labrador retriever named "Dog." On the evening of November 17, 2012, Markou, who was eighteen years old, was walking Dog in the family's neighborhood in Champaign. Dog was wearing a fabric collar underneath a metal "choker" collar that provided better control. His leash was attached to the choker collar.

By about 5:20 p.m., Markou and Dog were within about a half-block of home after having followed their usual route. Meanwhile, Tyrone Jones, who lived in the neighborhood and was walking to a friend's house, had spied a gray and white pit bull running loose in the area. Jones did not recognize the dog, so he stopped at several houses on the way to his friend's to see if anyone else recognized it. No one did. Jones was sitting on his friend's front steps and could see Markou and Dog when they approached the intersection of John Street and Crescent Drive. When Markou and Dog began to head south on Crescent, the pit bull spied them from across the street and ran toward them. Once the pit bull reached them, the two dogs sniffed each other briefly, and then, without warning or

provocation, the pit bull lunged at Dog's neck. Dog began to defend himself, and the dogs were soon locked in a fight.

Jones ran across the street to help Markou. Jones and Markou tried to separate the dogs by kicking at them and using a tree branch, but they were unsuccessful. At Jones's suggestion, Markou dropped Dog's leash so that Dog could more freely defend himself. Three juveniles arrived on the scene and were watching the dogfight. Before long, Jones asked Markou if she wanted someone to call the police to get help. Markou agreed, and someone called the police and reported the dog attack.

At the time, Officer Davis was in his squad car on the way to a call about a residential burglary. The police dispatcher reported over the radio that a vicious pit bull was attacking another dog near the corner of John and Crescent. Davis testified at trial that the dispatcher also said that one dog was "almost dead." Davis's route took him past the corner of John and Crescent, and someone in the group of people watching the dogfight flagged him down, so Davis pulled over and trained his spotlight on the dogs.

When Davis got out of his car, he asked what was going on. Markou, who was or had been crying, identified herself as the owner of the dog that was being attacked. The juveniles, who were standing farther away from the dogs than were Markou and Jones, were yelling. Markou told Davis that her dog was the brown lab, had collars and a leash, and was being attacked. Jones testified that he also told Davis that Markou's dog was the brown lab and the stray dog was gray and white.

Davis testified at trial that his first impression was that the dogs were both "dark color." He has a form of colorblindness that makes it difficult for him to distinguish between certain colors, including between gray and brown. Although Davis acknowledged that the colorblindness has had some effect on his daily life and his abilities to act as a police officer, as of the time of trial he had not informed his employer of his condition.

Davis walked in a semicircle around the dogs and saw that one dog was on top of the other, the dog on top seemed larger and more aggressive, and the dog on the bottom had a white belly. (Markou, however, testified that although Dog was taller than the pit bull, one dog was not on top of the other.) No one saw any wounds or blood on either dog. The dogs were focused only on each other and did not appear to pose any immediate threat to the people present. Davis testified that he went through a "mental checklist" of his options because in his experience, pit bulls fight to the death. (He had responded to two calls in the past that involved pit bulls fighting.) Davis considered that the police department was undergoing a shift change at the time; in his estimation, animal control officers would take fifteen minutes to arrive if called; he had a metal baton, but would risk getting bitten and did not know what to do with the pit bull if he was able to get the dogs separated; he did not have a catch pole, which was back at the station; and in his experience, oleoresin capsicum (OC) spray does not work on fighting dogs. Davis also worried that the pit bull might turn on the persons present.

After walking partway around the dogs, Davis stood a few feet away from them, drew his service weapon, made sure no person was standing behind them, and shot at the dog that in

his view was the aggressive dog, the one "on top." The dogs did not separate, so Davis fired a second shot a few seconds later. The dogs separated. Dog began limping toward Markou, who cried out that Davis had shot her dog. Davis testified that he could not believe that he had shot the wrong dog. In Jones's opinion, Davis looked "confused."

Davis then aimed his gun at the pit bull, which had started to move away from the scene, and fired four more times. The pit bull trotted across the street. Davis followed and fired a seventh and final shot at the pit bull when it reached the intersection of John and Crescent and headed east. He lost sight of the pit bull and returned to Markou's side while using his radio to call a supervisor and animal control. Davis's supervisor, Sergeant Matthew Crane, arrived at the scene within a few minutes. Within ten to fifteen minutes, perhaps less, an animal control officer arrived. That officer captured the pit bull and took it to the animal control facility. Dog died as a result of the gunshot wound.

When Davis left the scene, he returned to the police station and wrote a report about the incident, which was admitted into evidence at trial. From the time Davis had arrived at the scene to the time he fired the seventh shot, about two minutes elapsed. Markou testified that thirty to forty seconds elapsed between the time Davis arrived and the time he began shooting.

## PROCEDURAL HISTORY

On November 8, 2013, plaintiffs filed their complaint against the City and Davis. Seeking damages under 42 U.S.C. § 1983, they alleged that Davis's actions in shooting and killing

Dog constituted an unconstitutional seizure of their property. Against Davis, they sought damages for conversion of their property, and Markou sought damages for intentional infliction of emotional distress. Plaintiffs also sought damages and injunctive relief for violation of the Illinois Humane Care for Animals Act, and they brought *Monell* and respondeat superior claims against the City.

Defendants moved for summary judgment on all of plaintiffs' claims. Plaintiffs cross-moved for summary judgment as to liability on all of their claims. In a written opinion issued on May 18, 2015, the district court granted the City's motion in full, granted Davis's motion as to plaintiffs' state-law claims and denied it as to the § 1983 claim, and denied plaintiffs' motion for summary judgment.

On the § 1983 claim against Davis, the case proceeded to a three-day jury trial in July 2015. The parties agreed that the shooting of Dog constituted a seizure; the only issue at trial was whether Davis's conduct was reasonable. On July 9, 2015, the jury found in favor of Davis and against plaintiffs, and the district court entered judgment on the verdict the same day.

Plaintiffs then filed a motion for a new trial, which the district court denied. Plaintiffs filed a timely notice of appeal.

## DISCUSSION

Plaintiffs raise three issues on appeal.[1] First, they contend that the district court erred in concluding that Davis had not committed any discovery violations and erred in denying their motion for a new trial that was based upon those alleged violations. Second, plaintiffs argue that the court erred in refusing their proffered jury instruction on the Fourth Amendment reasonableness analysis. Third, plaintiffs assert that the jury's verdict went against the manifest weight of the evidence.

### A.  Alleged Discovery Violations

We review a district court's discovery determinations and denial of a motion for new trial for an abuse of discretion. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 832 (7th Cir. 2013). Where an alleged error of admission of evidence occurred during a trial, we will grant a new trial only if the error had a substantial influence over the jury and the result reached was inconsistent with substantial justice. *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 564 (7th Cir. 2006).

Plaintiffs argue that the district court erred in allowing Davis to do the following at trial: 1) testify that he heard the police dispatcher say that one dog was "almost dead"; 2) expand upon his police report by testifying that he considered several factors in a "mental checklist" prior to using his gun, including the fact that a shift change was imminent, and that

---

[1] Plaintiffs raise an additional issue pertaining to the district court's grant of summary judgment in favor of the City, but it is in play only if this court vacates the judgment against Davis. Because we affirm that judgment, we need not address plaintiffs' fourth issue.

he rejected options like using his baton or OC spray or waiting for someone to bring a catch pole; and 3) call his report an incomplete summary and contradict what he said therein about what he was able to see (the dogs' colors) when he pulled up in his vehicle. According to plaintiffs, because Davis had not previously disclosed this information by supplementing his discovery responses, it was an abuse of discretion for the trial court not to bar this evidence.

Plaintiffs cite two of their interrogatories to Davis. In the first (#7), they asked: "Describe in Your own words the Incident, starting from the dispatch call that sent You to the Incident and ending with your last involvement in any way Related to the Incident (whether that last involvement was writing a report, discussing the Incident with a supervisor, etc.), except only for Your communications with Your attorneys concerning This Litigation. Include with the description Your explanation for each action You took, and state and describe as precisely and exactly as You can what each person said." Davis responded by stating that his recollection of the incident was contained in his police report, which had been produced. In the second interrogatory (#10), plaintiffs asked Davis: "Identify all facts upon which You have based Your Answer, or have otherwise relied upon, in making the denials of the allegations of the following paragraphs of the Complaint: 41, 42, 43, and 44." Those paragraphs of the complaint alleged that Davis's conduct was objectively unreasonable and intentional or reckless. In his response, Davis stated that all such facts were contained in his police report. Davis did not mention in the report that he knew about any statement by the dispatcher that one dog was "almost dead," nor did he

mention going through a mental checklist of his options prior to the shooting. He also did not testify about these matters at his deposition. At trial, Davis acknowledged it was only during discussions with counsel while preparing for trial when he first recalled hearing the dispatcher's statement. Davis also testified at trial that his police report was an incomplete summary of the incident.

In plaintiffs' view, Davis's failure to disclose this information was unjustified and prejudicial. They argue that the information came as a "complete surprise," the timing precluded them from developing or offering countervailing evidence, and the jury verdict was the result of the "surprise evidence." Plaintiffs say that had they received timely notification of the information, they could have obtained and offered a recording or transcript of the actual dispatch, if available, or the dispatcher's or other officers' testimony about what was said; presented evidence to contradict Davis's assertions about a shift change and the catch pole; challenged Davis's assertions about the pitfalls of using OC spray; and asked Sergeant Crane about these matters had he not already testified.

Federal Rule of Civil Procedure 26(e)(1)(A) provides that a party who has made a disclosure or responded to an interrogatory must supplement or correct his disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Federal Rule of Civil Procedure 37(c)(1), titled "Failure to Disclose or Supplement," provides: "If a party fails to provide information or identify a witness as

required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence … at a trial, unless the failure was substantially justified or is harmless." In addition to or instead of this sanction, the court may order the payment of expenses caused by the party's failure, inform the jury of the failure, and impose other sanctions.

When plaintiffs objected to Davis's testimony at trial and requested "appropriate sanctions," the district court denied the motion, finding that there was no surprise and noting that trial testimony can sometimes involve matters, even important ones, that were not explored during depositions. The court further remarked that plaintiffs' counsel had impeached Davis and would have the opportunity to impeach him again by pointing out that during his deposition, he had failed to mention some of the matters about which he was now testifying. Later, in its ruling on plaintiffs' motion for a new trial, the district court concluded that there was no discovery violation because the subject matter of Davis's challenged testimony had been disclosed during discovery, and at trial Davis merely added details to his previously-disclosed narrative. The court reiterated its prior observation, both before and during trial, that plaintiffs' view of discovery is "unrealistic."

The interrogatories on which plaintiffs rely were not tightly focused. They were better suited for a deposition, so it is understandable that Davis simply pointed to his police report to answer them. During discovery, plaintiffs were given the police dispatcher's log stating that a pit bull was attacking another dog and "the dog is almost dead." Nothing prevented plaintiffs from seeking a recording or transcript of the dispatcher's actual statements over the radio. Plaintiffs' counsel

asked Davis at his deposition about what he had heard the dispatcher say, but failed to ask him if he had heard that specific statement. (In fact, counsel asked *Crane* about it but, inexplicably, did not ask Davis.) As for Davis's thought process, that is not the kind of information one would expect to find in a police report, and plaintiff's counsel had the opportunity to explore that topic at Davis's deposition but barely skimmed the surface. Counsel asked Davis about his shift, but not about shift changes, and did not ask about all of Davis's options. For instance, plaintiffs' counsel was aware that Davis carried OC spray, and could have asked more questions about that. Plaintiffs were provided in discovery all the information they needed to ask Davis the right questions before trial.

In any event, even if Davis had violated Rule 26 by failing to supplement his discovery responses, the failure was harmless. Davis's trial testimony was not materially different from what he had disclosed in discovery, and to the extent he contradicted his previous testimony or his report, plaintiffs had the opportunity to, and did, impeach him. Furthermore, there was no reason why plaintiffs could not have recalled Sergeant Crane to ask him about the other aspects of Davis's testimony.

As the district court aptly observed, Davis's discovery responses were not a script that he was bound to recite verbatim at trial. The court did not abuse its discretion in denying plaintiffs' motions for sanctions and for a new trial.

### B. Jury Instruction on Reasonableness of the Seizure

We review challenges to jury instructions de novo and afford the district court "'substantial discretion with respect to

the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law.'" *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009) (quoting *United States v. Gibson*, 530 F.3d 606, 609 (7th Cir. 2008)). "When it comes to potentially confusing or misleading instructions, the reviewing court is to first ask if the correct message was conveyed to the jury reasonably well." *Id.* (internal quotation marks omitted). "This inquiry is done by examining the instructions as a whole, in a common sense manner, avoiding nitpicking. If the instructions fail in this regard, a new trial is appropriate only if the instruction prejudiced the complaining party." *Id.* (citation omitted).

The killing of a companion dog constitutes a "seizure" within the meaning of the Fourth Amendment. *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (citing *Altman v. City of High Point, N.C.*, 330 F.3d 194, 204-05 (4th Cir. 2003); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994); and *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano Cty.*, 278 F.3d 1007, 1013 (9th Cir. 2002)). Therefore, Officer Davis's actions were constitutional only if reasonable. *See id.* (citing *United States v. Place*, 462 U.S. 696, 703 (1983)).

The district court gave the following jury instruction regarding reasonableness:

> You must decide whether Defendant's seizure was unreasonable from the perspective of a reasonable officer facing the same circumstances that Defendant faced. You must make this decision based on what Defendant knew at the time of the incident, not based on what you know now. In deciding

> whether Defendant's seizure was unreasonable, you must not consider whether Defendant's intentions were good or bad.
>
> In performing his job, an officer can use force that is reasonably necessary under the circumstances.

This instruction was based largely on Seventh Circuit Pattern Jury Instruction 7.09. The jury was also instructed that the term "seizure" referred to the shooting of the dog.

Plaintiffs argue that the court's instruction insufficiently stated the law because it did not guide the jury in assessing reasonableness in the context of the shooting of a household pet. They submit that the court erred in rejecting their proposed addition to the instruction, drawn from *Viilo*, 547 F.3d at 710: "[U]se of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."

The district court rejected plaintiffs' request to add this language, and, in its opinion denying plaintiffs' motion for a new trial, explained that *Viilo* is distinguishable and the requested instruction would have confused the jury. We agree. *Viilo* involved police officers' shooting of one dog at the owner's house while the owner was present, not a fight between *two* dogs, one of which was evidently a stray, off the premises of any owner. Plaintiffs' proposed language does not fit the facts of this case. The pattern instruction was sufficient to inform the jury correctly of the applicable law.

### C. Manifest Weight of the Evidence

We apply the "abuse of discretion" standard of review to the district court's denial of plaintiffs' motion for a new trial on

the basis that the verdict was against the manifest weight of the evidence. *EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016) (citing *Lewis*, 590 F.3d at 444). We will set aside the verdict and remand for a new trial only if "'no rational jury could have rendered'" it. *Id.* (quoting *Smith v. Wilson*, 705 F.3d 674, 677-78 (7th Cir. 2013)). Under this analysis, we examine the evidence in the light most favorable to plaintiffs, while "'leaving issues of credibility and weight of evidence to the jury.'" *See id.* (quoting *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)). "Once the district court applies the correct law, its discretion is wide and our review deferential." *Whitehead v. Bond*, 680 F.3d 919, 929 (7th Cir. 2012) (brackets omitted) (quoting *Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 634 (7th Cir. 2011)). The district court "'is in the best position to evaluate the evidence and determine whether the verdict was against the manifest weight; it heard the witnesses testify, saw the evidence presented, and gained a better appreciation of the nuances of the case than could be gleaned from a cold, written record.'"  *Id.* (quoting *Mejia*, 650 F.3d at 634).

Plaintiffs cite the following undisputed facts in support of their assertion that the district court abused its discretion in denying their motion for a new trial: Davis shot Dog less than a minute after arriving on the scene; he spoke only briefly with Markou and Jones; he was informed that Markou's dog was brown and the pit bull was gray; he knew about his own colorblindness, that it had been a problem in the past, and that it could be a problem in the twilight; no person was in immediate danger; Davis knew that a number of alternatives to shooting the dogs existed but rejected them; and after he used his gun, he called for a supervisor and animal control, who

arrived within minutes. Plaintiffs further maintain that it was "simply unreasonable" for Davis to have behaved as he did.

When it ruled on plaintiffs' motion for a new trial, the district court applied the proper standard, citing *Mejia*, and reasoned as follows:

> At trial, this court had the opportunity to observe the manner and demeanor of the witnesses who testified. During their testimony, all three Plaintiffs, by their body language and choice of words, showed that they were angry and believed that they were entitled to substantial damages for the loss of their dog. It appeared that Plaintiffs' presentation of evidence was more focused on damages than liability. This court wants to be clear that Plaintiffs did present evidence from which a jury could have found in their favor. However, in contrast to the Plaintiffs, Defendant came across on the witness stand as a very reasonable person who came into a chaotic, emergency situation and did what he thought was best at the time. This court therefore concludes that the jury was presented with a legally sufficient amount of evidence from which the jury could reasonably derive its verdict in favor of Defendant.

We find no fault with this assessment of the evidence at trial, which also showed that Davis had prior experience with pit bulls and knew they could be vicious. And the dog involved in this fight was indeed described as vicious. Davis offered plausible reasons for rejecting alternative courses of action, including the risk of danger to the bystanders. Plaintiffs are adamant that this risk was not "immediate," but they fail

to acknowledge that a vicious dog was involved and the situation thus could have changed at any moment.

Plaintiffs merely recite the evidence that would have supported a verdict in their favor and fail to address the countervailing evidence and the district court's analysis. Based on the record, we cannot say that the district court, having observed the witnesses and assessed their credibility and heard the rest of the proof at trial, abused its discretion in holding that the jury verdict was not against the manifest weight of the evidence.

## CONCLUSION

We AFFIRM the judgment of the district court.